29 C.C.P.A. (Patents)

In re KESLING.

Patent Appeal No. 4531.

Court of Customs and Patent Appeals.
Dec. 29, 1941.

John D. Rippey, of St. Louis, Mo., for appellant.

W. W. Cochran, of Washington, D. C. (Clarence W. Moore, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming a decision of the examiner rejecting, for want of patentability in view of the cited prior art, claims 21, 30, 39 to 44, inclusive, 46, 47 and 49 of appellant's application for a patent. Claims 1, 3, 6, 8, 10 and 48 were allowed.

Claims 21, 44 and 46 are illustrative of the appealed claims and read as follows:

"21. Gear shifting mechanism of the character described comprising selective shifter elements, an actuator for selectively engaging and shifting said elements, a power device connected to said actuator for moving said actuator to shift the selected element, a follow-up valve mechanism for controlling said power device, and operating means connected to a part of said valve mechanism and to said actuator for longitudinal movements for regulating said valve mechanism and also for assisting said power device to move said actuator."

"44. Gear shifting mechanism of the character described comprising selective shifter elements, actuator means selectively engageable for shifting said elements respectively, a power means for imparting shifting movements to said actuator means, valve means for controlling the energization of said power means, a device connected to said actuator means and to said valve means for finally regulating said valve means and movable to assist said power means to move said actuator means, and an operating means connected to said valve means and to said device in a manner to engage said actuator means with the selected shifter element and to initially regulate said valve means and thereafter move said device as aforesaid."

"46. Gear shifting mechanism of the character described comprising selective shifter elements, an actuator for selectively engaging and shifting said elements, a power device connected to said actuator for moving said actuator to shift the selected element, connections for selectively engaging said actuator with said elements and for controlling energization of said power device and also for assisting said power device to shift the selected element or for completely effecting said shift when said operating means fails to energize said power device, and manual means for operating said connections."

The references relied upon are: Moorhouse, 1,993,015, March 5, 1935; Imblum, 1,258,337, March 5, 1918; Sanford et al., 2,113,860, April 12, 1938.

As may be gathered from a reading of the illustrative claims above quoted, appellant's application relates to mechanism for selectively shifting the gears of an automobile, whereby the manual operation normally is confined to effecting valve selection and regulation only, after which power means is operative to actually perform the mechanical function of shifting the gears. While the mechanism involved in appellant's structure is difficult to describe without the aid of drawings of a size not possible here, we will attempt to describe it sufficiently for the purposes of this opinion. The customary gear case is described, enclosing the usual gears and two shifting yokes mounted on slide rails. These yokes are interlocked and each has a notch which may be engaged by a block which is mounted on a spindle journalled in the gear case cover. This spindle is adapted to be rocked laterally of the gear case and moved longitudinally thereof. It is understood that when the spindle is rocked to one side the block will

engage the notch of one of the yokes and be free of the other, and be ready to move the yoke engaged longitudinally of the gear case in one direction or the other. When the spindle is rocked to the other side, the other yoke is similarly engaged, leaving the remaining yoke free. The spindle projects through one end of the gear case cover into a cylinder which is mounted on the outside of the gear case. On the end of the spindle projecting into said cylinder there is mounted a piston which is free to rotate about the spindle, but which is so mounted thereon that no longitudinal movement with respect to the spindle is possible. This piston divides the cylinder into two chambers. A tube leads out of the cylinder from each chamber, and these tubes are utilized, as hereinafter shown, for creating a partial vacuum in one or the other of said chambers, and for opening the other chamber to atmospheric pressure. It will thus be seen that movement of this piston longitudinally of the cylinder must result in similar movement of the spindle within the gear case, and consequent movement of the block and whichever of the two shifting yokes is engaged therewith. A curved tube projects from the other end of the gear case cover. The end of this tube away from the gear case is secured to what is designated a supporting member, generally cylindrical in shape. Within this curved tube is a flexible shaft, one end of which is secured to said spindle, the other end of the. flexible shaft being secured to a valve chest. The valve chest is mounted for rocking movement and for movement longitudinal of itself within the supporting member; the valve chest has cylindrical grooves which serve as ports, and access to these ports is secured by means of tubes which project through a slot in the supporting member. One of these tubes serves to limit the extent of the rocking movement of the valve chest by coming into contact with one or the other of the side walls of the aforementioned slot in the supporting member. The other end of the supporting member is secured to the instrument panel, and within this end of the supporting member there is mounted an operating shaft; this operating shaft projects through the instrument panel and there is attached at this end of said shaft an operating lever; the other end of the operating shaft is made integral with a valve member within the valve chest above referred to. The operating shaft is adapted to be rocked laterally and moved longitudinally of itself within the supporting member. A neutral groove in the operating shaft is engaged by a spring-pressed ball mounted in the wall of the supporting member, and this serves to hold the operating shaft in a neutral position. Stop-notches are also provided on the operating shaft to engage this spring-pressed ball, and said notches serve to limit the extent of longitudinal movement of the operating shaft and, of course, of the valve member. Means such as rubber tubes are used to connect the chambers of the cylinder hereinbefore described with the ports of the valve chest, and these ports are so arranged as to alternately create a condition of partial vacuum in one chamber while opening the other chamber to atmospheric pressure, depending upon the direction in which the valve member is rocked by the operating handle and further upon the direction in which longitudinal movement is imparted to the valve member by the operating shaft.

The method of operation may be summarized as follows. When the operator, by means of the operating handle, rocks the operating shaft, the spring-pressed ball is disengaged from the neutral groove, and one forward stop-notch and one rearward stop-notch are brought in line with the spring-pressed ball, there being a forward and rearward stop-notch in line on each side of the operating shaft. The rocking motion thus imparted to the flexible shaft causes the spindle to be rocked in the gear case cover, and the block is caused to engage the notch of the appropriate yoke for making the shift intended. Movement of the operating shaft longitudinally with respect to itself is then imparted to said shaft by the operator; this places the valves in communication with the appropriate ports, following which a pressure differential is created on opposite sides of the piston in the cylinder which results in movement of the piston (and spindle) in the proper direction. From this point, the shifting of the yoke and gears is carried on by the power imparted to the spindle through movement of the piston. It will be seen that this longitudinal movement of the spindle is accompanied by a similar longitudinal movement of the flexible shaft, the valve chest, and the valve member and operating shaft; the movement of the operating shaft stops when the spring-pressed ball engages the stop-notch in the supporting member, after which movement of the valve chest will continue until the ports of the valve are out of register, thus stopping further movement of the piston, spindle, and yoke, at which point the desired shift will have been completed.

As hereinbefore noted, the operating handle and shaft normally are used merely to select and regulate the valve mechanism, and the further function of shifting the gears is thereupon automatically accomplished by the power means described. If for any reason there is a failure of power, the gears may be shifted manually to the same position, the power necessary to actually move the yoke and shift the gears being supplied to the operating shaft by the operator, and thence through the flexible shaft to the spindle and shifting yoke. In other words, the operator will have to use greater force when moving the operating shaft longitudinally of itself after rocking the same out of neutral position.

The reference patent to Moorhouse, No. 1,993,015, was relied upon principally by the Patent Office tribunals in the rejection of the claims on appeal. This patent is directed toward the accomplishment of the same functions as is the application of appellant. Moorhouse shows a conventional automobile gear case with two shifting forks for engaging said gears in desired ratios, just as in appellant's structure. Manual means is provided for pre-setting a valve element controlling a power means, and pre-selecting which of the shifting forks will be operative. The power means of Moorhouse consists of a cylinder in which a piston head is mounted; the piston shaft of the Moorhouse power means is not directly connected to the gear shifting means, as in appellant's structure, but is connected thereto by a system of linkage. By means of the valve element in Moorhouse above referred to, suitable conditions of atmospheric pressure and partial vacuum are caused to exist in the chambers into which the cylinder is divided by the piston head, thus resulting in appropriate movement of the piston head and, consequently, of the shifting fork for completion of the shifting. Moorhouse contemplates the normal use of manual power for regulating the valve mechanism which controls his power means, and for selecting the fork to be engaged. Thereafter the functioning of his power means carries through the actual shifting operations. The operating means shown by Moorhouse, however, is a gear shifting lever of the type which is mounted in the top of the gear case and is adapted to be laterally tilted from neutral position, after which the lever is moved forward or backward as desired. His lever is pivoted in a bearing in the top of the gear case, and when the operating end of this lever is moved forward, for example, the lever actually is rotated about the pivot at the point where it is mounted in the gear case cover or tower. In the words of Moorhouse, "the gear shift lever is then rocked about the pivot pin * * * longitudinally of the transmission." Furthermore, the valve employed by Moorhouse is of a different type than that shown by appellant. It will suffice to say that, whereas in appellant's valve there are two movable parts, the valve chest and the valve element, the body of the Moorhouse valve is fixed in position. In appellant's valve the valve element is first moved into operative position with respect to the ports in the valve chest; the follow-up action consists of the valve chest itself being moved ahead with respect to the valve element until the ports in the valve chest are out of registry with those of the valve element, thus stopping further movement of the piston. In Moorhouse the valve element is moved by the operating means to a position whereby the motor is energized; thereafter movement of the piston is caused by a system of linkage to reverse the initial movement imparted to the valve element, thus restoring it to its initial position and stopping further movement. Finally, Moorhouse also contemplates and shows structure whereby the operations involved in shifting gears can be wholly executed by manual power in case the power means itself for any reason is not functioning. This is brought about by means of a lost-motion connection between the two portions into which his gear-shifting lever is divided within the gear-shifting tower, these portions being designated by him respectively as the "control portion" and the "operating portion" of his lever. The above is a general outline of the Moorhouse structure, but it is believed to be adequate for the purposes of this case. It will be observed that while the objective is the same in the Moorhouse patent as in appellant's application, the structure employed is quite different in the two.

The reference patents to Sanford and to Imblum were cited in connection with Moorhouse in meeting certain claims which involve details of appellant's valve assembly. We do not believe any extended description of these patents would be helpful, and it will suffice to say that in Sanford a follow-up valve structure is shown in which there are two movable elements whereby energy is initially supplied to a power means by moving the inner element of the valve structure into operative position; consequent motion of the piston within the pow-

er means then carries the other element of the valve with it until it restores the initial condition relative to the inner movable element, whereupon further movement is stopped. Sanford's valve functions in a manner similar to appellant's. Imblum's structure is shown in connection with the operation of a reversing gear for steam locomotives, and includes a follow-up valve in which there are also two movable elements. One distinction between Imblum and Sanford, however, is that upon the entry of pressure into one chamber of Imblum's power means, he stops further motion by introducing an equal pressure into his other chamber, thus creating a balanced pressure condition on the two sides of the piston. The valve mechanism itself, however, functions in substantially the same way as that of Sanford in so far as the two-element feature is concerned.

For the purposes of our discussion. we may divide the claims into three classes, the first class embracing claims 21, 30 and 49, the second class embracing claim 46, and the third class embracing claims 39 to 44, inclusive, and claim 47.

We will first consider claims 21, 30 and 49. The examiner placed in one group claims 21, 30 and 46, and apparently assumed that each of said claims contained the element of operating means connected to a part of the valve mechanism and to the actuator for longitudinal movements for regulating the valve mechanism. In this the examiner was mistaken with respect to claim 46, for this claim does not embrace such element, but claim 49 has such an element. Evidently the examiner inadvertently omitted claim 49 from the first group selected by him.

In the statement of the examiner we find the following:

Rejection of claims 21, 30, and 46:

"These claims were finally rejected as fully met in terms by Moorhouse. Applicant has urged that the control lever 27, being pivoted at 32, is not mounted for 'longitudinal movements', with which the Examiner is inclined to disagree for the reason stated in the final rejection which is as follows:

"The shift lever 27 of Moorhouse is similar to the conventional shifting mechanism used on some vehicles, which lever may be moved transversely of the plane passing through shafts 14 and 15 in order to select the proper shift rail 22 or 23.

"Actual shifting of the rails takes place only when the top of the lever is moved fore and aft in a plane parallel to the first mentioned plane; or in other words, longitudinally with respect to the main axis of the vehicle and transmission assembly. While the shift lever 27 does not move bodily, the movement discussed above is believed to satisfy the terms of the claims."

\* \* \* \* \*

"It is apparent that the mechanism of Moorhouse fully anticipates the terms of the claims; hence, the claims are unpatentable. Attention is again respectfully directed to the specification of Moorhouse wherein the term 'longitudinally' has the same meaning as applied in the claim, supra. It is therefore urged that the rejection of claims 21, 30 and 46 on Moorhouse be affirmed."

The Board of Appeals did not specifically refer to the holding of the examiner respecting longitudinal movements of the operating means, but impliedly agreed with him that the patent to Moorhouse disclosed such movements. The board, however, did correctly describe the gear shifting lever of Moorhouse as capable of being moved longitudinally with respect to the axis of the vehicle.

It is appellant's contention that the examiner and the board misinterpreted the element above described, found in claims 21, 30 and 49. It is his contention that the longitudinal movements embraced in said claims clearly mean that the operating means is movable longitudinally with respect to itself, and not with respect to some other part or element not referred to in the claims.

We are in agreement with this contention. Unless the words "longitudinal movements" in the claims mean longitudinal with respect to the operating means, they would have no meaning at all without the aid of the specification, for any movement of such means would be longitudinal with respect to some part of the vehicle.

Unless the meaning contended for by appellant be given to said words, they are ambiguous because not related to any point or plane, and in such case it is proper to resort to appellant's specification to ascertain the proper construction. In re Phelps et al., 47 F.2d 387, 18 C.C.P.A. (Patents) 1036.

An examination of appellant's specification clearly shows that the longitudinal movements referred to in the claims are movements longitudinal with respect to the axis of the operating means, and in no oth-

er way could appellant's structure accomplish the result secured by him.

There is no specific holding of the board that the longitudinal movements of Moorhouse are equivalent to the longitudinal movements disclosed and claimed by appellant. The decision of the board states: "It is obvious that the Moorhouse device differs greatly from appellant's structure although both devices apparently accomplish the same result. The examiner has rejected claims 21, 30 and 46 as being fully met in terms by the patent to Moorehouse. We are of the opinion that this language does not read on the Moorhouse structure, but we are of the opinion that the difference is not of patentable moment. Appellant uses as his actuator a sliding bolt device which is engaged directly by the hand. The patent shows a pivoted lever which has some mechanical advantages over appellant's actuator, but as stated by the examiner, appellant's type of actuator is substantially shown in the other references cited. The examiner has gone to considerable trouble to show how the structure disclosed in Moorehouse could be combined with the devices shown in the patents to Imblum and Sanford so as to meet all of the appealed claims. We believe that this combination of references is a fair one and the decision of the examiner is therefore affirmed."

■ If the board intended to place the rejection of claims 21 and 30 upon a ground other than that upon which said claims were rejected by the examiner, it failed to comply with rule 139 of the Rules of Practice in the United States Patent Office, which requires the board, when it finds a new ground for the rejection of claims, to make a statement to that effect with its reasons for so holding. Merely stating that the differences between the Moorhouse structure and that disclosed and claimed by appellant is of no patentable moment surely would not be a compliance with said rule if such statement was intended to be regarded as a new ground of rejection of claims 21 and 30. With respect to claim 46, as hereinbefore noted, no longitudinal movements are embraced therein.

■ While the quoted language of the board is very general, we are of the opinion that the statement that the difference between the structure of Moorhouse and that disclosed and claimed by appellant "is not of patentable moment" refers to the structure specifically referred to in the latter part of the quotation, and that the board did not intend to disagree with the examiner as to his construction of the term "longitudinal movements" in claims 21 and 30, which construction is also applicable to claim 49. Hence we do not think that the board intended to find any new ground of rejection of claims 21 and 30, and the Solicitor for the Patent Office before us does not so contend.

Therefore the question of whether there is no patentable distinction between the longitudinal movements disclosed by Moorhouse and those disclosed and claimed by appellant is not before us for consideration. The only question upon this branch of the case is the construction to be given to the words "longitudinal movements" in claims 21, 30 and 49.

We are of the opinion that the examiner misconstrued this term and his construction was not disapproved by the board; and inasmuch as we hold that the longitudinal movements of the operating mechanism for regulating the valve mechanism, etc., disclosed and claimed by appellant, are not disclosed in the Moorhouse patent, the decision of the Board of Appeals respecting claims 21, 30 and 49 should be reversed.

■ With respect to claim 46 we are of the opinion that it was properly rejected upon Moorhouse alone, for the terms of the claim are fully met by his disclosure.

With respect to the remaining claims, 39 to 44, inclusive, and claim 47, each of said claims embraces a follow-up valve structure in which there are two movable elements, which valve structure is not disclosed by the Moorhouse patent; but, as hereinbefore stated, such a valve structure is disclosed in each of the patents to Sanford et al. and to Imblum.

It was the view of the examiner and the Board of Appeals that it would not involve the exercise of the inventive faculty to combine the Moorhouse structure with the devices shown in the patents to Sanford et al. and to Imblum so as to meet these claims.

Whether such combination would be obvious to one skilled in the art is a highly technical question. That the Moorhouse structure would require some modification to effect such substitution is apparent, but that is immaterial if such modification would be obvious to one skilled in the art. We are not convinced that the Patent Office tribunals erred in holding that the combination referred to would be obvious to one skilled in the art.

Appellant's counsel stresses the statement in the decision of the board that "The ex-

aminer has gone to considerable trouble to show how the structure disclosed in Moore-house could be combined with the devices shown in the patents to Imblum and Sanford so as to meet all of the appealed claims." His brief states: "The disclosures of the reference patents do not constitute proper ground for the rejection of the appealed claims because the basic reference (Moor-house) 'differs greatly' from appellant's structure, such great differences remain after the attempted substitutions, it required 'considerable trouble' by the Examiner to 'show how' the substitutions could be effected, and such substitutions are unobvious and are not disclosed by the references."

We think appellant's counsel has not properly construed the statement of the board above quoted respecting "considerable trouble" by the examiner. There is no indication in the examiner's statement that he had any difficulty in combining the references, and when the board stated that the examiner had gone to "considerable trouble" we think it meant only that the examiner had taken pains in his statement to explain how the structures shown by the patents could be combined.

For the reasons stated herein, the decision of the Board of Appeals is reversed with respect to claims 21, 30 and 49, and the decision is affirmed with respect to claims 39 to 44, inclusive, and claims 46 and 47.