**HYDRAULIC PRESS CORPORATION, Inc., et al. v. COE.**
**No. 8210.**

United States Court of Appeals for the District of Columbia.

Decided Feb. 15, 1943.

Mr. D. C. Staley, of Dayton, Ohio, pro hac vice, by special leave of court, with whom Messrs. H. A. Toulmin, Jr. and John M. Mason, both of Dayton, Ohio, were on the brief, for appellants.

Mr. E. L. Reynolds, of Washington, D. C., with whom Mr. W. W. Cochran, Solicitor, United States Patent Office, of Washington, D. C., was on the brief, for appellee.

Before GRONER, Chief Justice, and VINSON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

Appellants' suit, to secure a decree authorizing the issuance of a patent, was filed pursuant to Rev.Stat. § 4915 (1878), 35 U.S.C. § 63 (1940). The appeal is from a judgment of dismissal. The claimed invention relates to a hydraulic press for forming sheet metal into various shapes. The principal issue is whether appellants' claims have been anticipated by the Ferris Patent, No. 1,970,134.

Claims 4, 5 and 7 are the only ones now in issue, the others having been abandoned or cancelled. Claim 4 may be taken as typical, but we set forth the other two in the margin, with variations from the language of Claim 4 indicated in italics.[1] Claim 4 is as follows:

---

[1] "5. A method of generating and utilizing hydraulic power for clamping articles being drawn comprising clamping the article by hydraulic means at its peri-

4. A method of generating and utilizing hydraulic power for clamping articles being drawn comprising clamping the article by hydraulic means at its periphery with different pressures at different locations therearound, applying a drawing force to the article while so clamped, *diverting a portion of the drawing force to generate hydraulic pressure during the drawing operation, and applying the pressure so generated to produce the clamping action.* (Italics added.)

Appellants' present position is that Ernst's invention over Ferris consists in the features disclosed in the italicized language. They insist, contrary to appellee's contention, that Ferris does not disclose them, and apparently concede that the features described in the remaining language are found in Ferris. The basic position of the Patent Office is that the claims are too broad. That is, they are drawn so broadly that they are readable on Ferris and consequently cannot be allowed, whether or not Ernst's modifications would be inventive and claims allowable if drawn in properly limited terms. However, it is not conceded that invention exists, and the District Court found expressly there is none. The positions of both parties have varied somewhat during the proceedings, including those in the Patent Office,[2] and in order to make the respective contentions clear we turn to a more specific statement of the facts.

The chief claimed advantages of appellants' invention are increased efficiency and economy of operation. Higher operating speed is achieved, it is said, at the same time with greater conservation of energy. It is not disputed that Ernst has made a useful improvement upon the prior art or that it has been commercially successful. Appellants' machine, as disclosed in the drawings, is much simpler than that of Ferris with, it may be assumed, the resulting economies simplicity usually brings.

The general characteristics of the two disclosures are set forth in the trial court's findings of fact as follows:

"The Ernst application here involved discloses an hydraulic press for forming sheet metal in which the metal to be shaped is clamped at its periphery while the central portion is forced into a die cavity by means of a plunger. The plunger is actuated by an hydraulically operated piston and the clamping pressure is applied by means of auxiliary pistons which move in cylinders formed in a block at one end of the main piston. The arrangement is such that as the main piston moves the drawing plunger toward the work it also serves to generate hydraulic pressure in the cylinders containing the clamping pistons.

"The Ferris patent No. 1,970,134 discloses a press in which a sheet of metal is clamped at its margin while the central portion is forced into a cavity by means of an hydraulically actuated plunger. The liquid for actuating the plunger is supplied by a pump which, the patent states, is driven at a constant speed. The same pump also supplies liquid to the hydraulically actuated mechanism which clamps the periphery of the sheet during the drawing operation. The clamping means may be adjusted to provide different pressures at different portions of the periphery. The means for effecting this adjustment comprises adjustable relief valves for releasing pressure fluid at different points on the periphery when predetermined pressures are attained."

The processes are identical in using hydraulic force, derived from a pump, for both clamping and drawing or plunging operations. The former holds the work piece in place, while the latter molds it to the desired shape. Both clamp the work

---

phery with different pressures at different locations therearound, applying a drawing force to the article while so clamped, diverting a portion of the drawing force to generate hydraulic pressure during the drawing operation, and applying the pressure so generated to produce the clamping action *and release the excess pressure at a predetermined maximum.*" (Italics added.)

"7. A method of generating and utilizing hydraulic power for clamping articles being drawn comprising clamping the article by hydraulic means at its periphery with different pressures at different locations therearound, applying a drawing force to the article while so clamped, diverting a portion of the drawing force to generate hydraulic pressure during the drawing operation, applying the pressure so generated *to assist the clamping action, applying a retracting force to the member applying the drawing force, diverting a portion of the retracting force to generate pressure and applying the pressure thus generated to maintain the clamping pressure during retraction.*" (Italics added.)

[2] Cf. note 3 infra.

piece at its periphery to a die, with different pressures at different locations around the periphery. In both this differential in clamping pressure is maintained by relief valves which allow the liquid to escape when the pressures reach desired points. This feature permits adjustment of the clamping pressure to work pieces of irregular thickness and shape. Both use hydraulically operated pistons or mechanisms for applying the clamping pressure. Both processes apply the drawing force to the central part of the work piece while it is held in place by the clamping force. Both use a piston to apply the drawing force, hydraulically operated. In both the drawing force, derived through the piston, forces the central portion of the work piece into a cavity in the die, thus molding the metal into the desired shape. These are the principal and basic features of identity, though it should be mentioned that in both instances the only force which is introduced into the machine, whether for the clamping or for the plunging operation, comes from a single source, namely, the pump which Ferris specifies shall be operated at constant speed.

We turn now to the features of difference. The two processes operate in opposite directions. In Ferris the die is at the top and the plunging piston at the bottom of the machine. Both the clamping and the plunging or drawing operations are applied in an upward direction against the work piece and the die. In Ernst the die is at the bottom and the plunging piston operates downwardly against the work piece and the die to which it is clamped. This difference in itself is immaterial. But the basic difference, and the one in which invention is claimed, lies in the operation of the clamping force. This will be described in detail. To do this, however, further attention must be given to the operation of the drawing force, with which the clamping force is associated in both machines, but in a somewhat different manner.

As has been stated, the whole force introduced into the machine in both cases, that is, the only external force, is derived from a pump, which in fact supplies the pressure for both the clamping and the plunging or drawing operations. Because it will be convenient to distinguish it from other forces, we shall call this total force introduced into the machine from the pump the external force.

In Ferris this force leaves the pump at one point and travels a very short distance, probably not more than a few inches, in a single pipe. The pipe then branches into two separate pipelines, one of which carries liquid to the clamping mechanism, the other conducting it to the plunging piston. One line therefore carries what may be called the clamping force, the other the drawing force. It is obvious that the clamping force is diverted from the supply line which extends from the pump to the drawing ram or piston. Operation of the clamping mechanism necessarily requires a continuous flow of liquid from the pump as long as the clamps are in action. In other words, the clamping pistons operate by direct and continuous application of force from the pump. It will be recalled also that the clamping pressures exerted by these pistons vary and the differential is maintained by relief valves which allow the liquid to escape when the pressure reaches a certain point. It is obvious there is a diversion of part of the external force from drawing or plunging purposes to the clamping function and that a part of the force diverted is entirely lost or wasted, namely, that represented by the liquid which escapes through the relief valves. Appellee says this constitutes a "diversion of drawing force" within the meaning of appellants' claims.

It should be mentioned also that Ferris' clamping mechanism is a complicated one, consisting of numerous pistons to each of which, through a cylinder, a portion of the clamping force is applied. In other words, after the liquid which supplies the clamping force is diverted from that which supplies the drawing force and has traveled a considerable distance to its work, the pipeline through which it runs is again divided into a number of smaller or separate ones, each of which leads into a cylinder from which a clamping piston is operated. Appellants characterize this general scheme of separating drawing force or liquid from clamping force out of the total external force supplied from the pump as being one of "independent fluid lines" or "parallel flow arrangement."

The method of separating the two forces, and especially of applying the clamping force, in Ernst is as follows. As in Ferris, the external force (liquid) leaves the pump at one point and travels a short distance through a single pipe. This leads to a four-way valve. From this valve, the

liquid which creates the drawing force runs through a pipe into the drawing cylinder where it exerts downward pressure upon the drawing piston head. As in Ferris, this creates the drawing force which performs the molding operation directly on the work piece. But, as will appear, it also has a part in the clamping operation. In other words, the downward application of the drawing force has two functions in Ernst, namely, the primary one of performing the drawing operation which molds the work piece, and a secondary one to assist in the clamping operation which holds it in place.

Understanding of the latter requires further detailed description of the clamping process and arrangement as a whole. Two features are outstanding, the arrangement of the clamping mechanism in co-ordination with the drawing mechanism and the method of introducing and applying the liquid used for clamping purposes. The former will be described first, as it supplies a basis for clear understanding of the latter.

In a very general way it can be said that the drawing and clamping functions are performed by the same machinery, but with the application of different forces at different intervals. More specifically, both drawing and clamping operations are performed by successive operations of the upper part of the press, that is, all except the stationary member or die at the bottom upon which the work piece is laid and to which it is clamped down for molding by depression into the cavity at the center of the die. This upper portion all moves downward, except the inverted cylinder at the top, which is stationary.

The movable apparatus consists principally of four parts, connected with each other in the following order from top to bottom: (1) The drawing piston which moves downward from the inverted cylinder when the drawing force is applied above the piston head; (2) a platen (or heavy metal block) which is attached firmly to the piston at its lower end, just outside the bottom of the inverted cylinder, and moves up and down exactly as the piston does; (3) a second, but much less thick metal block, otherwise of the same dimensions as the platen, which is called the clamping member and is *movably*, not firmly, attached to the platen just above it; and (4) a pressing member, which is shaped on its bottom to conform to the

cavity in the die and does the immediate work of molding the work piece by pressing it down into this cavity. The pressing member is attached firmly to the bottom of the platen in the center and moves up and down in exact co-ordination with the platen's motion. It does this through a hole in the center of the movable clamping member.

This somewhat complicated description of the whole movable upper portion of the press can be simplified somewhat by pointing out that the piston proper, the platen and the pressing member are all firmly attached together and move with one motion when pressure is applied from above or is released. Their principal function is the drawing operation. On the other hand, the clamping member is attached to the platen, not firmly, but movably, and therefore does not move with the identical motion which actuates the other parts, but moves with them in the same direction at a different rate. Its function is primarily in connection with the clamping operation.

The attachment of the clamping member to the platen is peculiar and important. It is accomplished by means of cylinders and pistons. The cylinders are located within the body of the platen and are inverted, as is the drawing or pressing cylinder. They may be called the clamping cylinders. Attached firmly to the top of the clamping member are two upright pistons which operate up and down within the clamping cylinders. They may be called the clamping pistons. When hydraulic pressure is applied within the clamping cylinders to the heads of the clamping pistons, the latter move downward and take with them the clamping member, which holds the work piece in place on the die.

Introduction of liquid into the clamping cylinder takes us back to the four-way valve, from which liquid also is introduced, as has been shown, through one outlet into the drawing cylinder chamber above the drawing piston head. Through another outlet from the valve liquid is carried by another pipeline into the drawing cylinder, but at a point near its bottom. Below its head the piston is somewhat smaller in diameter than the cylinder and in this space between the piston and the cylinder wall the liquid flows upward to a point just below the piston head. There it enters an aperture in the piston itself, which first leads horizontally to the center of the piston and thence downward through its

length and into the platen to a point about level with the tops of the clamping cylinders. From this point the liquid flows through horizontal apertures or "pipes" in the platen to the clamping cylinders and fills them. Check valves in the horizontal lines of flow prevent the liquid from returning in the direction of the pump when clamping pistons exert pressure upward against the liquid in the tops of the clamping cylinders. Apertures also lead outwardly from the clamping cylinders to the relief valves and thus allow escape of liquid from the cylinders when the clamping pressure reaches the desired point. This substantially completes the detailed description of the parts and arrangement of the mechanism and the manner in which the liquid is introduced for the work both of drawing and of clamping. It remains to describe briefly the co-ordinated operation of the process as a whole.

It is obvious that the clamping member, with its upright pistons resting against the liquid in the clamping cylinders contained in the platen, forms a kind of cushion between the die beneath and the movable upper portion of the press. The cushioning effect is useful chiefly in the clamping operation. This takes place, as in Ferris, just before the drawing operation. The whole process of clamping and drawing occurs, in a general way, as follows.

The clamping cylinders being filled with liquid (which takes place during upward recession of the drawing piston), liquid is pumped through the four-way valve into the drawing cylinder, and this creates pressure upon the drawing piston head driving the piston and the platen downward. As they descend, they meet resistance first from the action of the clamping pistons against the liquid in the clamping cylinders. This creates pressure in the latter, which continues until the point is reached at which the relief valves function to allow escape of liquid from the clamping cylinders. When this takes place, the clamping operation is completed and the work piece is held firmly in place between the clamping member and the die, ready for the drawing operation. Continued pressure then is applied to the drawing piston head, and this forces the drawing-piston—platen—pressing-member combination further down, so that the pressing member descends through the aperture in the clamping member, makes contact with the work piece, and presses it down into the die cavity, thus molding it to

the desired shape. When this is finished, the pressure on the drawing piston is removed, the drawing piston and other firmly connected parts return upward, thus releasing the pressure upon the clamping member, which then releases the molded work piece from its grasp. During the return stroke of the drawing piston upward, liquid again enters the clamping cylinders from the four-way valve, as above described, and fills them. The press is then ready to begin another clamping and drawing operation.

As has been said, Ernst and Ferris are alike in using a single pump which supplies the total external force and expels this for a short distance through a single pipe.

From that point there is difference. In Ferris the pump, moving at constant speed, supplies continuous pressure which is applied directly for both clamping and drawing. In Ernst there is likewise a separation of the drawing fluid pipe from the clamping fluid pipe, at the four-way valve. But the liquid does not flow through these pipes at the same time, as in Ferris, in a continuous column of pressure. As we understand the process, the liquid flows from the valve first through one, then through the other. It is only when the drawing piston is moving upward, and therefore no liquid is flowing to the head of the drawing piston, that fluid enters the clamping cylinders. Conversely when liquid is moving to the head of the drawing piston, and it is moving downward, the resulting pressure created by this movement in the clamping cylinders prevents entrance there of any liquid from the four-way valve. Thus, while in Ferris the pump supplies a direct, continuous and simultaneously working pressure through both the drawing fluid pipes and the clamping fluid pipes to the drawing piston and the clamping pistons respectively, in Ernst the pump supplies pressure which, after it leaves the four-way valve, is applied alternately, first to fill the clamping cylinders, then to drive the drawing piston down. Hence, the liquid in the clamping cylinders supplies the first resistance to the downward motion of the drawing piston, and this in turn creates a pressure of resistance in the clamping cylinders to the downward motion, which then continues its downward pressure for the drawing operation.

As distinguished from Ferris, therefore, the two liquid flow lines to the drawing and clamping cylinders operate in alternate in-

tervals to conduct the liquid for its work; the liquid introduced into the clamping cylinders acts directly in opposition to the force of the liquid applied to the drawing piston head; the entire external force of the pump is available to apply to the drawing piston head as it moves downward for the work; both clamping and drawing operations are accomplished with a single downward movement of the drawing piston; and the liquid introduced into the clamping cylinders during the previous return stroke of the drawing piston acts in performance of the clamping operation, not as a direct and continuous application of force from the pump (as it is in Ferris), but as a cushion creating resistance against the down stroke of the drawing piston. This arrangement and action appellants characterize as an application of force "in series" in contradistinction to the "parallel flow" arrangement of Ferris. In these features they now find the invention, though the claims were much broader when the proceedings in the Patent Office began.[3]

It may be that these features of improvement are inventive.[4] But, as the case is before us, the issue is whether the invention as described in Claims 4, 5 and 7 shows patentable features not disclosed in Ferris. The claims must be read therefore, not merely with a view to whether the allegedly patentable features they describe are disclosed in appellants' process, but whether Ferris also discloses them. Appellants insist the claims disclose invention beyond Ferris in the following features: (1) The *diversion* of a portion of the *drawing force*; (2) to *generate* hydraulic pressure; (3) *during* the drawing operation; and (4) *apply* the pressure so

generated to *produce* the clamping action (Claims 4 and 5); and (5) release the excess pressure at a predetermined maximum (Claim 5); or (Claim 7) to *apply* the pressure so generated to *assist* the clamping action, (a) applying a retracting force to the member applying the drawing force, (b) diverting a portion of the retracting force to generate pressure, and (c) applying the pressure thus generated to maintain the clamping pressure during retraction.

Appellee says there is no invention in these features, which are all readable on Ferris; and if there were invention in the alleged simplicity of the particular devices or applications appellants have made, they have failed to recite such features in the claims.

Appellants emphasize especially the *diversion* of a portion of the drawing force to *generate* hydraulic pressure during the drawing operation and apply this to the clamping action. They insist that "a portion of the 'force' *capable of being developed* by the press ram [drawing piston] has been diverted, or used, to generate the clamping pressure," (Italics added) and that this is not disclosed by or inherent in Ferris. In this they are at odds with appellee over the meaning of "drawing force." Appellants give it one of mathematical exactitude, appellee one of physical force without reference to quantity.

In appellants' view, there is a definite distinction between the "fluid pressure" developed by the hydraulic pump and "drawing force" as this term is used in their claims. According to this, "force" is the product of "area" times "pressure," so that if a fluid pressure of 2000 lbs. is de-

---

3 The application came successively before several examiners. The original ten claims were rejected first as being directed "to the method of drawing metal," which the examiner held the same regardless of the source of pressure fluid; he therefore rejected them twice on Ferris, basing the second rejection on the ground that "the source or manner of developing the clamping pressures is not a material and patentable limitation *in the method of drawing metal*." (Italics added)

Ernst then cancelled all claims except 4, 5, 6 and 7, and requested reconsideration for them stating: "These claims have been amended so that they are *no longer directed to a method of drawing articles* but are *now* directed to a *method of generating and utilizing hydraulic power for*

*clamping articles being drawn.*" (Italics added) The amended claims were again rejected: (1) As misleading, inaccurate and not readable on the instant disclosure; (2) on Ferris, as containing no more than functional limitations over that disclosure; and (3) as disclosing only the function of an apparatus, though purporting to be directed to a method. Claim 6 was then cancelled, and on reconsideration Claims 4, 5 and 7 were again and finally rejected on Ferris. The Board of Patent Appeals affirmed the examiner's decision, holding that "in so far as the claims recite true methods they do not distinguish in any patentable respect from the reference [Ferris]." This suit then followed.

4 Cf. text infra.

livered by the pump to the head of the ram and the latter contains 100 square inches, the "force" developed by the ram will be 200,000 lbs. If then a fluid pressure of 500 lbs. is to be developed in the clamping cylinders and the clamping pistons have a total effective area of 20 square inches, a "force" of 10,000 lbs. is needed .for the clamping pressure; and this will be diverted from the total force the ram can develop, leaving a "drawing force" of 190,-000 lbs. for the drawing operation. It is said the diversion is not wasteful, since appellants' so-called "series operation arrangement" permits greater speed of press cycle operation. This is because the entire flow of liquid from the pump is directed to the ram, so that by a continuous forward movement it closes upon the work piece and at the same time clamps it for pressing. Under Ferris' so-called "parallel flow arrangement," however, it is said the fluid pressure stands in the clamping cylinders and the drawing cylinder simultaneously, so that with a pump developing 2000 lbs. pressure, the "force" exerted by the clamping rams will be entirely independent of the "force" exerted by the drawing ram; and the fact that one pump supplies fluid pressure for both kinds of rams does not affect the "drawing force" capable of being produced and used for a drawing operation by the main ram. Thus, it is said, if the Ferris ram can produce a drawing force of 200,000 lbs., none of it will be diverted, "because there is no resistance offered to the advancement of the main ram other than the metal blank." Consequently, appellants conclude, there is no diversion of "drawing force" in the Ferris process. Nor, further, is there generation of clamping force during the drawing operation by such a diversion.

Appellee objects to this mathematical view of "drawing force" and to identifying "drawing force" exclusively with the power applied by the *ram*. This, on two grounds: first, that the language of the claims should be given the broadest interpretation it will reasonably support, cf. In re Carr, 1924, 54 App.D.C. 283, 297 F. 542; second, because "drawing force," as appellants use it, does not mean, as might be supposed, the force applied to the tool which actually does the drawing, but refers to the force exerted on the piston which actuates the drawing tool. The two are not the same, since part of the former is diverted to the clamping mechanism of

Ernst and never reaches the drawing tool or pressing member. Hence, appellee urges, "drawing force" must be construed to include any force, a portion of which is eventually applied to the drawing tool. The claims are not limited to an arrangement in which force is diverted from a piston or equivalent member and, in fact, no such member is recited in any of them. Accordingly, it is said, appellants have drawn their claims broadly to include any arrangement in which part of a force directed toward the drawing member is deviated to the clamping mechanism, and this is disclosed in Ferris.

Since the latter's pump projects a continuous column of pressure to the ram and also to the clamping mechanism, and this flows through one pipe from the outlet of the pump to the point of separation, the diversion of part of the pressure created by the pump to the clamping mechanism, is a diversion of "drawing force." Without this diversion, the whole of the pressure delivered by the pump would be delivered to the drawing operation. It is not material, in appellee's view, so far as the claims are concerned, whether the clamping pressure is generated directly by fluid diverted from the supply line of the main ram or is allowed to pass to the ram and then is built up as clamping pressure by elements acting in opposition to the ram. The action of the press is the same in either case.

The word "force" may have a mathematical or technical physical meaning and one of common usage. The two are not identical, but they are closely related. As applied to physical forces, the one is a function of the other. We need not determine whether, in view of this, the difference would be sufficiently substantial to support as inventive a claim using the one when considered in relation to a prior disclosure using the other. As to that, because of their obviously close relationship, we have some doubt. But we have more that the term "drawing force" was used in appellants' claims solely in its mathematical or technical physical meaning, as now is claimed.

None of the three claims gives any evidence of having been drawn in technical mathematical language or that of physics. All are drawn in commonly used mechanical terms. This is, perhaps, commendable. But it is also revealing. It is difficult to believe that claims drawn thus

would depart, in a single instance, from the general pattern to employ a term in an unusual technical meaning, without saying so explicitly, particularly when the term has also a common one which fits into the pattern. "Force" may mean either exact pressure times exact area to which the pressure is applied, or it may mean simply an operative physical power, without taking account of the exact quantity applied. There is nothing to show that the claims were concerned with exact quantity of force, whether "drawing," "clamping," or "retracting." They were concerned with the application of forces performing different functions, but not with the exact volume of any. There is therefore no more reason for believing that "drawing force" was used with greater reference to its quantity or amount than was "retracting force" (Claim 7), or "hydraulic power," "with different pressures," "the excess pressure," etc. We think therefore that the term must be taken, both from the general pattern and purpose of the claims and from its more ordinary meaning, to have been used in its common, rather than its more technical sense. The history of these claims, as shown by the record, also lends weight to this view.[5] And it derives support from the rule, stated in In re Carr, supra, that the claims must be given the broadest interpretation of which they reasonably are susceptible. Furthermore, if we were in greater doubt than we are, the matter has been found against appellants both by the trial court and consistently in the Patent Office. In view of this, we should be hesitant to overturn their findings, though our own view might lean the other way. Abbott v. Coe, 1939, 71 App. D.C. 195, 109 F.2d 449.

It follows that the claims, so far as they rest upon "diverting a portion of the drawing force" and applying this "to generate hydraulic pressure during the drawing operation" and then applying the generated pressure to produce clamping action, are readable directly on Ferris. Claim 4 and so much of Claims 5 and 7 therefore were properly rejected.

Claim 5 includes the additional limitation of releasing the excess pressure in the clamping mechanism at a predetermined maximum. Ferris clearly discloses this feature.

Claim 7 adds that pressure is maintained upon the clamping mechanism during the withdrawal of the drawing plunger. Ferris does not mention this specifically, but it does not involve invention, nor is it claimed to do so apart from the other features. In the Ferris structure, this could be accomplished obviously by maintaining the supply of pressure fluid to the clamping mechanism until it is desired to release the clamps. Claim 7 also states the pressure applied to the clamps during retraction of the drawing piston is generated by diverting a portion of the retracting force. (It is not claimed this has a mathematical significance such as is claimed for "drawing force.") In Ferris, retraction of the ram is accomplished by pressure from the pump and the pump also provides the pressure for actuating the clamping mechanism. Hence, the clamp pressure may be regarded as generated by a diversion from the retracting force. Claims 5 and 7 therefore also were properly disallowed.

We need not determine whether in some one or more of their mechanical structures appellants have perfected an invention over Ferris. If they have done so, what is new and inventive has not been described in claims sufficiently definite and limited. That their machines involve useful improvements is not disputed. We express no opinion whether these amount to invention. In our opinion the evidence is sufficient to sustain the trial court's finding that the claims in issue disclose no invention over the Ferris patent and disclosure.

Accordingly, the judgment is affirmed.

---

[5] Cf. note 3 supra.