**WAYNE et al. v. HUMBLE OIL & REFINING CO.**

No. 11933.

United States Court of Appeals Fifth Circuit.

June 3, 1949.

As Modified on Denial of Rehearing July 20, 1949.

John H. Bruninga, St. Louis, Mo., Dewey F. Fagerburg, Richard L. Johnston, Chicago, Ill., Paul A. Smith, Houston Texas, for appellants.

J. Vincent Martin, Jack D. Head, Earl Babcock, Nelson Jones, Houston Texas, for appellee.

Before HUTCHESON, SIBLEY, and WALLER, Circuit Judges.

SIBLEY, Circuit Judge.

Appellant Wayne is the inventor and owner of the two patents in controversy, No. 2,294,877, granted Sept. 1, 1942, and No. 2,281,694, granted Oct. 23, 1945, both entitled "Treatment of Drilling Fluids". Appellant Visco Products Company is exclusive licensee under the patents, and National Lead Company is a sublicensee and distributor of unpatented materials for use under the patents. Appellee Humble Oil and Refining Company is charged with infringement of all the claims of both patents. Humble denies the validity of the patents and asks a declaratory judgment that they are invalid, and denies infringement, and

alleges misuse of the patents to defeat relief.

The district court adjudged that no misuse of the patents was shown, and that conclusion we uphold. It also adjudged that the first patent was infringed if valid, and that the second was not; but that both patents were invalid as to all claims; and the original and supplemental complaints were dismissed. The defendant's prayer for declaratory relief was not pressed. The principal matter for decision on this appeal is the validity of the patents.

The district judge found the disclosure and claims insufficient in that the quantity, kind, or proportion of the ingredients to be used in treating the drilling fluid are not stated; nor the method of their use so as to effectively control the viscosity or the thixotropic properties of the fluid; or to define the invention so that one could avoid infringement; and there was a finding of a want of invention in view of the prior art. The record is immense: it is impractical even to summarize it. But we will state the origin and scope of the patents.

The drilling fluid to which they relate is that universally used in rotary drilling of oil and gas wells, originally a thin mud of about the consistency of lubricating oil, which is forced down the hollow drill stem through the bit which it cools, washing out the cuttings, which are carried up outside the drill stem to the surface, where the coarse particles are screened or settled out, and the mud used again in a continuous process. The mud also seals off porous strata which may be pierced, and by its hydrostatic pressure prevents the well from "blowing out", to which end it often has its specific gravity increased by the addition of heavier material than clay, such as barytes. The drilling fluid must be thick enough to carry the cuttings up, but thin enough to be pumped and to allow the coarse particles to settle out for reuse, and in case of stoppage of the work to prevent "freezing" the drill stem, so that it cannot be started again or withdrawn from the well. The viscosity of the fluid is thus important, and also important is the ability to "gel", or set like thin gelatine when agitation ceases, holding everything in suspension, but becoming fluid again when agitation is resumed. This is called the "thixotropic" quality of the fluid, or its "gel strength". It is present in most clays, but not all, and may be increased by adding bentonite and similar substances. The viscosity and gel strength may be much affected by the kinds of strata cut through, by the loss by absorption of water or the inflow of that and other fluids, by temperature, or by chemically active substances encountered. Viscosity and gel strength must be watched and corrected if possible all during the drilling, there being simple instruments for testing both at the mouth of the well. Water added was of course the original thinner; but adding water reduced the specific gravity of the drilling fluid, decreasing its hydrostatic pressure, and its ability to float the cuttings and the barytes in it. All additions were usually made before it was returned to the well by the pump. As chemicals taken up in the drilling were found to affect viscosity and gel strength, other chemicals purposely added were found which would arrest unwanted effects or produce those desired. All this was well known when Wayne, in 1930, began to work on finding chemicals which would control the viscosity and gel strength of the drilling fluid. Others were pursuing the same thing. Wayne produced what he called Stabilite No. 1, which contained an orthophosphate, and Stabilite No. 2 which contained none. In April, 1932, he discovered that other water-soluble phosphates would better control viscosity and thixotropic properties. In April, 1934, he put on the market, unpatented, Stabilite No. 3 containing sodium hexa-metaphosphate, which worked well. One Cannon, working for Humble, testifies to using the same chemical a little earlier, but the Board of Patent Appeals awarded priority to Wayne. Within two years Wayne filed an application for a patent but sought to cover the whole field of soluble phosphates. We digress to explain that all phosphates are salts of phosphoric acid. They are very numerous, probably hundreds of them, known or capable of being produced. Those in whose molecule there is but one atom of phosphorus are called orthophosphates, and are the more common in nature. Those in

whose molecule there are two or more atoms of phosphates are polyphosphates; one having six atoms of phosphorus being a hexaphosphate, as the sodium hexaphosphate above mentioned. There is another division of polyphosphates into meta-phosphates and pyrophosphates.

Now Wayne in his first application filed May 25, 1935, claimed a patent on the use of "soluble compounds containing the radical of ortho-, meta-, or pyro-phosphoric acid" (Claim 8) and "a water-soluble phosphate and water-soluble alkali in the mud" (Claim 12) and the same ortho-, meta-, and pyro-phosphoric acid soluble compounds in Claims 18 and 22. The disclosure also mentions no discovered difference between the ortho- and poly-phosphates. It developed that the orthophosphates, relatively cheap and common, had been in use for the purposes disclosed in the patent application before Wayne claimed to have made his invention. On March 27, 1936, Wayne filed another application which finally became the second patent in suit, wherein for the same purposes he claimed a patent on "the meta-phosphate radical", and "a salt of meta-phosphoric acid" and "an alkali metal hexa-metaphosphate", and more specifically "a sodium poly-metaphosphate". His Stabilite No. 3 embodied the last named. Then on Sept. 5, 1941, Wayne made a new application in continuation of his first one, which resulted in the first patent now in suit, in which he dropped all claims on orthophosphates and made claims only as to "a water-soluble polyphosphoric acid compound", "a water-soluble salt of phosphoric acid compounds consisting of the metaphosphoric and pyrophosphoric groups", "an alkali metal pyrophosphate" and "sodium pyrophosphate". Several other investigators had also made use of various phosphates in oil well drilling since early in 1934 and were claiming patentable inventions. There was long litigation with them in the Patent Office. Priority was awarded to Wayne, but the examiner denied Wayne a patent on the use of polyphosphates for lack of invention in view of the prior art, and because their action differed only in degree and not in kind from the previously used orthophosphates. The Board of Patent Appeals thought otherwise and patents issued on claims which are hereinafter summarized and considered.

1. The first patent has 17 claims. No. 1 reads: "A mud laden drilling fluid containing a small percentage of a water-soluble polyphosphoric acid compound". No. 2 is for "the process comprising adding to the drilling fluid a small percentage of a water-soluble polyphosphoric acid compound". Nos. 3 and 4 claim a mud laden drilling fluid "containing a small percentage of a water-soluble salt of a class of polyphosphoric acid compounds consisting of the metaphosphoric and pyrophosphoric acid groups", and "the process of adding the same". Nos. 5 and 6, 7 and 8, include also "a lyophile colloid". Nos. 9 and 10 substitute for the colloid "a buffer"; Nos. 11 and 12 include both the colloid and buffer; Nos. 13, 14, 15 and 16 repeat in substance but in slightly different words Nos. 1 to 4. No. 17 is, "A mud laden drilling fluid containing a small percentage of sodium pyrophosphate". The colloid and buffer ingredients in some of the claims are concededly old in the art. The questions are whether the use of water-soluble polyphosphates (which are the compounds of polyphosphoric acids) is patentable; and if so whether the disclosure and claims are according to law.

We do not reexamine the question of priority between Wayne and Humble's Cannon, but let that stand as found by the Patent Office. But we think the examiner was correct in holding that the use of all water-soluble polyphosphates in controlling viscosity and gel strength of the drilling mud was not patentable in view of the prior art. "Flocculation" and "gelling" and deflocculation by chemical "peptizers" were terms used in patents and scientific literature before 1934 in connection with the problems Wayne claims to have solved. "Thixotropic" is a newer name for the same phenomena. The orthophosphates were used as "peptizers" in drilling muds, Wayne himself using one of them in his Stabilite No. 1. In the Stabilite No. 3 he used a polyphosphate, but in his first application for patent, as above pointed out, he taught no difference. Yet he finally got his patent on the superior efficacy of certain polyphosphates which he had tested. The peptizing

effect being apparently due to phosphorus, and the polyposphates having more phosphorus in them, one would expect a better result from their use. It would certainly not be a surprising result. Several other experimenters got the same result at near the same time, which tends to show that skill rather than invention was present. Moreover in the patent to Feldenheimer No. 1,438,588 [1] granted Oct. 12, 1922, and the use of polyphosphate salts in the deflocculation of clay in water suspension was clearly taught and patented. The terms used are "deflocculator" or "peptizing agent", and the advance claimed is in the use of "metaphosphoric acid in connection with an alkaline agent, or of an alkali salt of meta- or pyrophosphoric acid"; and sodium and potassium pyrophosphate are specially mentioned. Sodium pyrophosphate is the very thing Wayne claims in his Claim No. 17. It is true that Feldenheimer was not dealing with drilling mud, so that his patent is not an anticipation in the same art, but he was dealing with the deflocculation of clays in general, the object being to reduce viscosity and flocculation (gelling) without adding more water, so that the heavier impurities would more readily and rapidly be dropped from the clay in aqueous suspension. In drilling mud the fluidity and deflocculation are not to be carried so far, for the heavier barytes and cuttings are not to be deposited in the well but carried up and screened out or slowly deposited in the pit at the surface. But the point is that Feldenheimer and not Wayne was the discoverer that these polyphosphates will reduce viscosity and gelling without adding undesirable water. To utilize their known properties in this respect in dealing with clay in aqueous suspension in a drilling mud, does not in our opinion require more than skill. The Claim No. 17 is for the use of the very same polyphosphate in dealing with drilling mud to do what Feldenheimer taught in 1922 it would do with clays generally in water suspension. And the same considerations invalidate Wayne's broader claims covering all polyphosphates.

2. One may not patent a mere idea, although novel and useful. It must be reduced to practice. And the practical method of making and using it must be described "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * * [to] use the same". 35 U.S.C.A. § 33. This disclosure is to enable the public to use the invention after the patent expires, and is the consideration for the grant of the patent with its temporary right to exclude others. Wayne's claims all speak of "a small percentage of" the polyphosphate and are in themselves wholly vague, but may of course be aided by the specifications preceding them, where the full disclosure properly belongs. Even there the "small percentage" is repeated without definition, but in the examples given a ten percent solution of the polyphosphate is used. It is stated however, as Feldenheimer also stated, that the amount of the solution that must be added to the mud depends on the kind of clay in water suspension and other variable conditions, and must be the subject of some experimentation and skilled judgment. This is plainly true in well drilling, where the character of the mud changes as the drilling proceeds, temperature changes, and disturbing chemicals may be picked up. The drilling mud must be and may be by known methods frequently tested. How much polyphosphate must be added and how often cannot be a matter of formula, and must be a matter of skilled experiment and judgment. On this point the vagueness being inevitable is excusable. Minerals Separation, Ltd., v. Hyde, 242 U.S. 261, 270, 37 S.Ct. 82, 61 L.Ed. 286. Less than one percent is used in some of the examples given. So also the failure to state where and how the polyphosphate solution is to be added is supplied by skill in the art, for the mud is always prepared and altered at the mouth of the well before being pumped down. We find no fatal lack in the disclosure.

3. The claims, except No. 17 which we held specially above to be not patentable, are invalid because too broad. They attempt to cover the use in drilling mud of any and all soluble polyphosphoric acid

[1] See, also, Companion patent to Feldenheimer No. 1,438,587 granted the same date.

234

compounds. The undisputed evidence is that such compounds are of unknown number, more than a hundred having been made and many others not having been yet produced or experimented with. Wayne had tested only a part of those known. They have been found variously effective. Other inter partes tests were made during this trial which showed no uniformity of action among the polyphosphates tested, a few being ineffective with some clays, and some causing a bad rather than a good result as more was added. It is well known that there is no certainty that various compounds of a chemical (here polyphosphoric acid) will all have the same physical or chemical properties, and that only testing them will tell. Erratic results with the polyphosphates here appear. In this state of his experimentation and knowledge Wayne claims too much in excluding all others from using all water-soluble polyphosphoric acid compounds, known or unknown, tested or untested.

Nor can this over-claim be aided by restricting the claims to the polyphosphates mentioned in the disclosure as having been tested. The claims fix the limits of the patent. The inventor "shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery". 35 U.S.C.A. § 33. Ambiguity in language may be cleared up by reference to the specifications, but the claim, when unambiguous, can neither be expanded nor contracted thereby. Graver Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 277, 69 S.Ct. 535. These claims of Wayne are unambiguous, and claim too much. They are for this reason invalid.

4. The second patent is less ambitious, and in fourteen claims covers the use in drilling mud of "an agent containing the metaphosphate radical", or "a salt of metaphosphoric acid", with or without "an organic protective compound" or "a lyophile colloid", (that is a buffer), and more specifically an "alkali metal hexa-metaphosphate", and more specifically still in the last claim, "sodium metaphosphate". The last is what was in public use in Wayne's unpatented Stabilite No. 3; and what was successfully used by Humble and The Texas Company and others, purchased elsewhere than from appellants. The metaphosphates, however, are themselves a large group of the polyphosphates, some not yet experimented with, and what has been said of polyphosphates in general applies to them. We think all but the last claim in this patent are invalid for the reasons given above as to the first Wayne patent. Claim 14 for sodium metaphosphate is sufficiently specific, but we find there was no invention in using sodium metaphosphate in drilling mud any more than there was in using sodium pyrophosphate under Claim 17 of the first patent, in view of what was known in the art in 1934.

5. Humble has used both sodium hexametaphosphate and sodium pyrophosphate in drilling mud without license from Wayne or his licensees, and has infringed if the patents, and particularly the last claim in each, were valid. But having held them invalid, there is no occasion for further inquiry. The judgment of dismissal is

Affirmed.