The **LAITRAM CORPORATION,**
Plaintiff,

v.

**DEEPSOUTH PACKING CO., Inc.,**
Defendant.

**Civ. A. No. 67–861.**

United States District Court
E. D. Louisiana,
New Orleans Division.

April 7, 1969.

See also D.C., 279 F.Supp. 883.

Lewis. H. Eslinger, Guy W. Shoup, New York City, Louis B. Claverie, New Orleans, La., for plaintiff.

Harold J. Birch, Washington, D. C., Emmett Pugh, New Orleans, La., for defendant.

RUBIN, District Judge:

Brevity may be wit's soul but it is no part of patent litigation. This case is proof enough. It involves two patents for use in deveining shrimp. Disregarding scriptural advice,[1] and assisted no doubt by the ease with which dictating machines, electric typewriters, and elec-

1. Ecclesiastes, XXXII, 8, "Let thy speech be short, comprehending much in few words." The court acknowledges the equal applicability of this unheeded admonition to its own opinion.

trostatic reproduction processes produce paper work in volume, counsel have favored the court with a total of over 500 pages of briefs and memoranda. They have submitted pre-trial memoranda, trial briefs, post trial briefs, reply memoranda, second reply memoranda and even a reply to a memorandum in opposition to a "Memorandum In Reply To Defendant's Memorandum In Opposition to Post-Argument Memorandum of Plaintiff." In doing so, they have not overlooked any issue that might conceivably be drawn into an infringement suit or its defense. Doubtless they have been stimulated by pedagogic duty in their attempts to educate a court unlettered in patent law. But the educational process has been difficult for the student as well as lengthy for the tutor, and it remains to be seen whether the lesson has been well learned.[2]

Shrimp, whether boiled, broiled, barbecued or fried, are a gustatory delight, but they did not evolve to satisfy man's palate. Like other crustaceans, they wear their skeletons outside their bodies in order to shield their savory pink and white flesh against predators, including man. They also carry their intestines, commonly called veins, in bags (or sand bags) that run the length of their bodies. For shrimp to be edible, it is necessary to remove their shells. In addition, if the vein is removed, shrimp become more pleasing to the fastidious as well as more palatable. Until recent years, these peeling and deveining operations had always been performed by hand or with simple tools.

The Lapeyres, Fernand and James, who are assignors of the plaintiff, set out to solve the peeling problem. They succeeded in doing so, but the Skrmettas, father Paul and son Raphael, a family engaged in the shrimp business, developed a competing device. In a lengthy infringement suit, whose story has been told elsewhere,[3] the patent problems relating to the shrimp peeler were disposed of.

The machine that peeled the shrimp, however, left their veins intact. As labor costs increased, it became economically desirable to find both a less expensive way to devein large shrimp and a way to devein the medium sized shrimp that were then being processed without deveining. The Lapeyres, therefore, decided to invent a machine that would do this.

After years of effort, study, and experimentation, they finally solved part of the problem with a device remarkably simple in operation. The invention was based on their discovery of facts that, once learned, appear obvious. These facts, and their relationship to deveining shrimp, however, had eluded all others. They consisted of nothing more than the observations that, (a) since the body of a shrimp is curved and cylindrical in shape and the heavier mass is on the outside of the curve, the center of gravity on its body is nearer the outside curve than the inside, and it, therefore, will tend to slide down an inclined surface on its side, with its outer body curve forward and downward; (b) if the shrimp slides against a sharp cutting surface with the outer curve hitting the surface first, the cutting surface will open the sand bag by the force of gravity alone, and this will in turn expose the vein; (c) if the sand bag is cut, and the vein is partially exposed, it can be drawn from the shrimp without the necessity of cutting the shrimp the entire length of the bag; and (d) so long as the cut exposes the vein, it is not necessary that the cut be centered directly on the shrimp's body.

2. Mr. Justice Frankfurter dissenting in Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 60–61, 63 S.Ct. 1393, 1421, 87 L.Ed. 1731, pointed out: "It is an old observation that the training of Anglo-American judges ill fits them to discharge the duties cast upon them by patent legislation."

3. Laitram Corp. v. Deepsouth Co., E.D. La.1968, 279 F.Supp. 883.

Having learned this, the Lapeyres patented a device that was illustrated in the patent drawings as follows:

The embodiment of this patent, as it is marketed by plaintiff, looks like this:

The Skrmettas in turn devised and patented a machine utilizing the knowledge about shrimp learned by the Lapeyres. Unlike the Lapeyres' device, however, it operates with a trough that is rocked to and fro. The patent drawings illustrate the machine this way:

Fig.4

Fig. 9

And the machine that defendant is marketing looks like this:

Plaintiff contends defendant is infringing its patent both literally and under the doctrine of equivalents. Defendant denies infringement in all respects, and in addition asserts that the claims of plaintiff's slitter patent ('218) are invalid if given the breadth necessary to embrace defendant's slitter, either as anticipated by or obvious in the light of the prior art, or on grounds of indefiniteness and undue breadth. Responding to plaintiff's invocation of the doctrine of equivalents, defendant claims that there is no infringement under the doctrine of equivalents, and that, alternatively, if the doctrine does apply, the corresponding theory of file wrapper estoppel forecloses plaintiff from asserting it. Finally, defendant contends that even if plaintiff's '218 patent is both valid and infringed, it is unenforceable against defendant because of laches and estoppel.

Although the Lapeyres' machine successfully slit shrimp, it did not succeed fully in deveining them. So they developed and patented another device to complete the process. This machine is basically a rotating drum. Its surface consists of a metal skin with punctured lips. The lips hook the veins that have been exposed by the slitting process and draw them from the shrimp. The following drawings from the 2,825,927 patent demonstrate the operation:

The manufactured machine looks like this:

*Exterior*

The perforated material that is used for the drum is not patented. Indeed, the Lapeyres ordered it from a commercial firm's catalogue.

The Skrmettas needed a deveiner too. So they developed a conveyor belt type deveiner using a similar perforated material. At the time of trial, a patent application, serial no. 561,534, was pending before the Patent Office. On December 10, 1968, patent no. 3,414,934 was granted to Raphael Q. Skrmetta and Cecil B. Skrmetta for their deveiner.

Defendant's manufactured deveiner looks like this:

*Exterior*

Plaintiff contends defendant's deveiner infringes its '927 patent. Defendant on the other hand, urges that the asserted claims of the deveiner patent are invalid as overbroad, indefinite, described in functional language, anticipated by the prior art, and obvious. And, if the patent is valid, defendant claims it has not been infringed. Finally, defendant contends that even if the '927 patent is both valid and infringed, it is unenforceable against defendant because of laches and estoppel.

The findings of fact reached after study of the evidence embodied in over 1800 pages of record and in approximately 525 exhibits are set forth separately. The conclusions of law that are to be applied to them are set forth below.

### VALIDITY OF THE PLAINTIFF'S SLITTER PATENT ('218)

■■ An issued patent is presumed valid. Hunt Tool Co. v. Lawrence, 5 Cir., 1957, 242 F.2d 347, 351. "An alleged infringer who assails the validity of a patent bears a heavy burden of persuasion and fails unless his evidence has more than a dubious preponderance." Great Lakes Carbon Corporation v. Continental Oil Company, W.D.La.1963, 219 F.Supp. 468, 481, affd. 5 Cir., 1965, 345 F.2d 175; Radio Corporation of America v. Radio Engineering Laboratories, 1934, 293 U.S. 1, 8, 55 S.Ct. 928, 79 L.Ed. 163.

■ As set forth in the findings of fact, plaintiff's discoveries were profound. The patent they developed based on these discoveries was a pioneer one. When observed in operation, the slitter covered by the '218 patent works so easily and the principles on which it is based are so apparent that they prompt the commonplace observation, "why didn't someone think about that before?" But as the Supreme Court pointed out in Goodyear Tire and Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 279, 64 S.Ct. 593, 594, 88 L.Ed. 721: "Viewed after the event, the means [plaintiff] adopted seem simple and such as should have been obvious to those who worked in the field, but this is not enough to negative invention." Not only did no one develop such a machine before; many had tried without success.[4] As the findings of fact point out, there was a clear need for the slitter and it was immediately recognized as a solution by the industry.[5]

It is true that the principles on which the slitter operates were not new, for the Lapeyres neither invented gravity, nor discovered the lubricating quality of water; they did not design the biological qualities of shrimp nor originate the cutting force of knives. But although their invention incorporated known forces as well as newly discovered properties, the state of the prior art was clearly not "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art * * *." 35 U.S.C. § 103.[6]

■ The Lapeyre slitter was indeed a "new and useful * * * machine

4. In discussing validity in Reiner v. I. Leon Co., 2 Cir., 1960, 285 F.2d 501, 504, Judge Hand raised the following questions as "sign posts": "how long did the need exist; how many tried to find the way; * * * how immediately was the invention recognized as an answer by those who used the new variant?"

5. The machine was offered to the industry in July, 1954 and before the commencement of the next shrimp season in the Gulf of Mexico more than 16 canners (nearly 50% of the market) in the five states bordering the Gulf, where all domestic commercial shrimp deveining or

canning is located, had leased plaintiff's machines. Today, every shrimp cannery that deveins at least 100 cases of shrimp a year utilizes either the Laitram or Deepsouth machinery.

6. In Graham v. John Deere Company, 1966, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, the court suggested the following as "indicia of obviousness or nonobviousness": "commercial success, long felt but unsolved needs, failure of others." See Note, Subtests of "Nonobviousness": A Nontechnical Approach To Patent Validity, 112 U.Pa.L.Rev. 1169 (1964).

* * *." [7] and added "a new and valuable article to the world's utilities * *." Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. "While a scientific truth or the mathematical expression of it, is not patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be," [8] and the Lapeyres invented such a structure.

The '218 patent was neither anticipated by nor obvious in the light of the prior art. No "prior patent or other publication * * * bear[s] within its four corners adequate directions for the practice of the patent * * *." Dewey and Almy Chemical Co. v. Mimex Co., 2 Cir., 1942, 124 F.2d 986, 989. Nor are its claims indefinite or unduly broad. The statutory requirements of distinctness and particularity have been met,[9] and the public has been informed of the patent's coverage and limitations. United Carbon Co. v. Binney and Smith Co., 1942, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232. Patent No. 2,694,218 is therefore valid.[10]

### LITERAL INFRINGEMENT

"The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. * * * It is to the claims of every patent, therefore, that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for by the statute * * *." Motion Picture Patents Co. v. Universal Film Manufacturing Co., 1917, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871; Texsteam Corp. v. Blanchard, 5 Cir., 1965, 352 F.2d 983.

Plaintiff avers that claims 1, 3, 9, 10, 11, 12, 14, and 15 of Patent No. 2,-694,218 have been infringed. In the findings of fact, the conclusion is reached that none of these claims has been literally infringed by defendant's rocking trough slitter.[11]

Only claim one requires additional analysis. It reads:

"A shrimp de-veining machine comprising an inclined trough, a water supply to said trough, and knives carried by said trough and being spaced above the trough and being oppositely inclined along a path down the trough, said knives extending partially diagonally of the path in successively opposite directions."

In order for defendant's slitter to infringe claim one, its knives must be "oppositely inclined along a path down the trough" and they must extend "partially diagonally of the path in successively opposite directions." The interpretation of this claim, therefore, depends on the meaning of the word, "path," in this context.

---

7. 35 U.S.C. § 101.

8. Mackay Radio and Telegraph Co. v. Radio Corporation of America, 1939, 306 U.S. 86, 94, 59 S.Ct. 427, 431, 83 L.Ed. 506. "An idea or concept is not patentable." Thomson Machinery Co. v. Larose, E.D.La., 1961, 197 F.Supp. 636; Le Roy v. Talham, 1852, 55 U.S. 156, 187, 14 How. 156, 187, 14 L.Ed. 367; Wayne v. Humble Oil and Refining Co., 5 Cir., 1949, 175 F.2d 230. 35 U.S.C. § 101 grants but also limits patent protection to "any new and useful process machine, manufacture, or composition of matter." As the Court pointed out in Brenner v. Manson, 1966, 383 U.S. 519, 536, 86 S.Ct. 1033, 1042, 16 L.Ed.2d 69, "A patent system must be related to the world of commerce rather than to the realm of philosophy."

9. 35 U.S.C. § 112 provides: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

10. "[T]he ultimate question of patent validity is one of law." Graham v. John Deere Company, *supra*, 383 U.S. at 17, 86 S.Ct. at 694; Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 155, 71 S.Ct. 127, 95 L.Ed. 162.

11. Infringement is a question of fact. Hahn & Clay v. A. O. Smith Corp., 5 Cir., 1963, 320 F.2d 166.

In defendant's machine, each shrimp must travel down one of a number of different "lanes" or "passageways" that are arranged in a parallel manner:

## Figure 1

The sides of each lane are the knives themselves. As each shrimp moves down the trough through a lane, it is rocked back and forth from one knife to the other and therefore journeys along a zig-zag route from top to bottom:

## Figure 2

Plaintiff urges that "path" in claim one means the path of each individual shrimp, the zig-zag route outlined above. He contends that defendant's knives are

oppositely inclined along a path thus defined, and extend partially diagonally of it, hence that claim one reads literally on defendant's slitter.[12]

 Patent "claims must be given the broadest interpretation of which they reasonably are susceptible." Hydraulic Press Corp. v. Coe, 1943, 77 U.S.App.D.C. 251, 134 F.2d 49, 56.[13] This is "well settled." [14] But "[t]he rule is [equally well settled] that, in construing the words of a claim where the language is susceptible of more than one construction, the disclosure of the specification must be resorted to to ascertain the proper construction." In re Phelps, 1931, 47 F.2d 387, 388, 18 CCPA 1036.[15] Since "a patentee is at liberty to supply his own dictionary, the terms of a claim should be taken in the sense given in the lexicon of the specification." Jones v. Sykes Metal Lath & Roofing Co., 6 Cir., 1918, 254 F. 91, 96.

The '218 specification reads in part:

"The blade assemblies are arranged angularly or diagonally with respect to the long axis of the trough and the blades are relatively staggered from one side of the trough to the other.

The upper ends of the blade assemblies are disposed closer to the side walls and from this point the blade assemblies progress downwardly and toward the opposite side walls of the trough. The lower end portion of each inclined blade assembly is so related to the upper end of the next assembly in order that the shrimp will be delivered in succession from the lower end of one assembly to the upper end of the opposed successive assembly, it being understood that the exposed portions of the knife blades are turned mutually toward one another. Thus, altogether the blade assemblies form an irregular or zig-zag path down the center of the trough which the shrimp are compelled to follow."

Here the word "path" is not used to indicate the exact route of each individual shrimp but refers instead to the space formed by the blade assemblies through which the shrimp must pass on their descent down the trough, i. e., in defendant's slitter—the lanes or passageways formed by the knives and located between them as diagramed in Figure I, *supra*. In plaintiff's machine, the path

12. Even assuming the correctness of plaintiff's interpretation of "path," claim one still may not be literally infringed. While defendant's parallel knives may be inclined to the zig-zag path of the shrimp, they are not necessarily "oppositely inclined" nor do they clearly extend "partially diagonally of the path in successively opposite directions." In addition, the knives are oppositely inclined along the path of a shrimp only when the shrimp is at a point on its journey between the knives. When the shrimp collides with a knife, the knives are not inclined to that point "along" the path.

13. "Were this not true, few patents could give any protection, for some departures from the precise disclosure are nearly always possible without losing the benefit of the invention." Musher Foundation v. Alba Trading Co., 2 Cir., 1945, 150 F.2d 885, 889.

14. Rajchman v. Herbert, 1963, 312 F.2d 926, 50 CCPA 995.

15. Lincoln Stores v. Nashua Mfg. Co., 1 Cir., 1946, 157 F.2d 154; Musher Foundation v. Alba Trading Co., *supra*, 150 F.2d at 888; In re Kesling, 1941, 124 F.2d 193, 197, 29 CCPA 786; Turchan v. Marzall, D.D.C., 1952, 105 F.Supp. 266, 268. "The claims of a patent are always to be read or interpreted in the light of its specifications." Schriber-Schroth Co. v. Cleveland Trust Co., 1940, 311 U.S. 211, 217, 61 S.Ct. 235, 238, 85 L.Ed. 132. The claim itself of course "measures the grant to the patentee," and the specifications may not be used to expand or limit the claim. Graver Tank & Mfg. Co. v. Linde Air Products Co., 1949, 336 U.S. 271, 277, 69 S.Ct. 535, 538, 93 L.Ed. 672. See also, In re Cresswell, 1951, 187 F.2d 632, 38 CCPA 917; In re Hegan, CCPA, 1938, 97 F.2d 86, 88. However, when the claim is ambiguous, the court must "resort to the specifications," Graver Tank & Mfg. Co. v. Linde Air Products Co., *supra*, and interpret the claim in their light. Application of Erickson, 1948, 171 F.2d 307, 309, 36 CCPA 734; In re Hegan, *supra*.

formed is indeed "irregular" or "zig-zag" because the knives are arranged angularly in the manner described in the specifications.[16] But in defendant's slitter, the knives are parallel to each other, and the path formed by the blade assemblies is rectilineal.

■ "The language used in specifications and claims of a patent must be construed in accordance with its plain, usual, and ordinary meaning." American Aerovap, Inc. v. Cauthorn, N.D.Tex., 1952, 103 F.Supp. 9, 11; Application of Taylor, 1951, 193 F.2d 335, 39 CCPA 786; Application of Erickson, 1948, 171 F.2d 307, 309, 36 CCPA 734. Only if the words used are intelligible to the reader do claims perform their function of "inform[ing] the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not." United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 232, 63 S.Ct. 165, 168, 87 L.Ed. 232. Reading the word "path," as it is used in claim one, in the light of this rule and with the additional illumination cast by the specification, its most reasonable and natural meaning is the space between the knives through which the shrimp must progress on their journey down the trough.[17] Under this interpretation, the term "path" is a static rather than a changing concept for it does not vary with the particular route taken by each individual shrimp.[18] The machine need not be in operation, therefore, for the path to be determined.

In defendant's machine, the knives are parallel to the path. They are neither

16. The zig-zag path formed in plaintiff's slitter by the blade assemblies (Figure A) of course differs from the zig-zag route of each shrimp as it travels down the trough bouncing from knife to knife (Figure B).

*A* *B*

17. Plaintiff's interpretation found on p. 7 of his final brief (November 25, 1968) also applies: "the portion of the surface of defendant's trough defined by the knives which the shrimp traverse."

18. In defendant's machine, the exact route taken by each shrimp depends upon the speed with which the trough is rocked, the amount of water fed into the trough, and the amount of time a shrimp remains lodged against each knife.

"oppositely inclined along a path" nor do they extend "partially diagonally of the path in successively opposite directions." Claim one therefore is not literally infringed.

## DOCTRINE OF EQUIVALENTS

If patents were interpreted only by the literal scope of their claims, minor deviations in the structure of almost any invention could be devised to elude the protection of the patent.[19] The doctrine of equivalents evolved to protect the patentee from devices that differ merely in "name, form, or shape" [20] from the patented invention but perform "substantially the same function in substantially the same way to obtain the same result." Sanitary Refrigerator Company v. Winters, 1929, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147.

"The essence of the doctrine," we are told in Graver Tank and Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, "is that one may not practice a fraud on a patent." It was designed "to temper unsparing logic and prevent an infringer from stealing the benefit of the invention." L. Hand, Royal Typewriter Co. v. Remington Rand, Inc., 2 Cir., 1948, 168 F.2d 691, 692. By "express[ing] a preference for substance over verbiage," [21] it also "serves an important procedural function in the patent scheme * * * by reducing the otherwise inordinate length to which language might have to be carried." Borg-Warner Corp. v. Paragon Gear Works, Inc., 1 Cir., 1965, 355 F.2d 400, 404. Moreover, since the doctrine assures the patentee the benefit of his invention, it fosters the disclosure rather than the concealment of inventions," which is one of the primary purposes of the patent system." Graver Tank and Mfg. Co. v. Linde Air Products Co., supra, at 607, 70 S.Ct. at 856.

Because the doctrine of equivalents is based on equitable considerations,[22] the principle has developed "that an inventor, with respect to his patent, is entitled to a range of equivalents commensurate with the scope of his invention." Up-Right, Inc. v. Safway Products, Inc., 5 Cir., 1963, 315 F.2d 23, 26. Accordingly, primary and pioneering patents are granted a broad range of equivalents. Hunt Tool Co. v. Lawrence, 5 Cir., 1957, 242 F.2d 347, 351.

The '218 patent is indeed a primary patent. The pioneering efforts of the Lapeyres resulted in a totally new machine. While others in the shrimp industry could have observed the qualities of shrimp, and developed a trough lubricated by water with sharp blades to slit the shrimp thereby exposing their viens, no one but the plaintiff did. The '218 patent, therefore, must be afforded a broad range of equivalents.

In order for defendant's slitter to be an equivalent of the device claimed by the '218 patent, it must perform "substantially the same function in substantially the same way to obtain the same result." Sanitary Refrigerator Co. v. Winters, supra. But while substantial identity of function, operation, and result are necessary, the doctrine "does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents." Graver Tank and Mfg. Co. v. Linde Air Products Co., supra, 339 U.S. at 609, 70 S.Ct. at 857.

In Judge Hutcheson's words, "the decisive question here is, reading the claims of plaintiffs' [pioneer] patent on the [defendant's machine] and interpreting them fairly in accordance with their plain intent and coverage, does de-

19. See Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S. at 607, 70 S.Ct. 854.

20. Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935.

21. Spee-Flo Mfg. Corp. v. Binks Mfg. Co., S.D., Tex., 1967, 264 F.Supp. 542, 545.

22. Ditto, Inc. v. Minnesota Mining and Mfg. Co., 8 Cir., 1964, 336 F.2d 67, 72.

fendant's device infringe?" Matthews v. Koolvent Metal Awning Co., 5 Cir., 1946, 158 F.2d 37, 40. Like Judge Hutcheson, "We think it does." Equivalence is primarily a determination of fact,[23] and as the findings of fact point out, defendant's slitter is substantially identical to and infringes claims one and three of plaintiff's pioneer patent.

■ The doctrine of equivalents protects the "essence" of the patentee's invention. Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 1958, 258 F.2d 124, 137. It insures that the principle and substance of the invention are not appropriated. Grant Paper Box Co. v. Russell Box Co., 1 Cir., 1946, 154 F.2d 729, 731. Essentially, plaintiff has patented a device in which shrimp slide down a trough hitting knives at an angle so that their backs are slit and their veins are exposed. Defendant's slitter operates on the same basic principles, performs the same function and achieves the same result. As discussed, *supra*, claim one does not read literally on defendant's slitter because the knives in defendant's machine are not "inclined along a path down the trough" but are parallel to the path. Claim three is not literally infringed because defendant's water supply is not specifically "directed upon the shrimp." In both instances, however, defendant offers merely minor deviations in structure. Instead of using inclined knives to shunt the shrimp from side to side, it has substituted a rocking trough.[24] For lubrication, rather than a water spray directed on the shrimp, defendant has substituted a supply of running water.

■ In analyzing substitute ingredients, "[c]onsideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." Graver Tank and Mfg. Co. v. Linde Air Products Co., *supra*, at 609, 70 S.Ct. at 857. With these minor deviations, defendant's machine performs the same function, achieves the same results, and operates in substantially the same manner as plaintiff's '218 patent prescribes. The shrimp are caused to hit knives at an inclination as they slide along a path down the trough. Their backs are slit and their veins are exposed. The "interchangeability" of these minor deviations in form is apparent to the eye.

■ The doctrine of equivalents serves to enable courts to depart from a literal meaning of patent claims to reach a "just result." Royal Typewriter Co. v. Remington Rand, Inc., *supra*, 168 F.2d at 692. This case clearly calls for its exercise. While the claims of the Lapeyres' pioneer patent have been avoided in form, their invention has been utilized in substance. Borrowing from Judge Hutcheson again in *Matthews, supra*, 158 F.2d at 40, "the doctrine of equivalency has never been a mere dry bones doctrine. Put forward to do justice and prevent defrauding by dissimulation and deceit, it should be, it has been, applied to give its equitable purpose effect. Not at all recondite or difficult of understanding or application, it is the mere expression and application of the view that like things are alike and that they are not made unlike by formal and nonsubstantial changes, no matter how cunningly contrived the dissimulation, how clever the changes in form." Claims one and three of the '218 patent have been infringed under the doctrine of equivalents.

---

23. Graver Tank & Mfg. Co. v. Linde Air Products Co., *supra*, 339 U.S. at 609, 70 S.Ct. 854; Chemical Cleaning, Inc. v. Dow Chemical Co., 5 Cir., 1967, 379 F.2d 294, 296.

24. In Warren Telechron Co. v. Waltham Watch Co., 1 Cir., 1937, 91 F.2d 472, 473, defendant substituted "the pull of a spring for the pull of gravity." The Court stated that these were "typical equivalents."

## FILE WRAPPER ESTOPPEL

█ "Carried to an extreme, the doctrine of equivalents could undermine the entire patent system." Borg-Warner Corp. v. Paragon Gear Works, 1 Cir., 1965, 355 F.2d 400, 404. In order to strike a balance between the doctrine of equivalents and the excessively formal alternative of holding a patentee to the exact wording of his claims no matter how harsh the result, the countervailing equitable doctrine of file wrapper estoppel has been developed by the courts. *See generally,* Exhibit Supply Co. v. Ace Patents Corp., 1942, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736.

The file wrapper contains the complete Patent Office file of papers relating to the patent. Secret and confidential while the patent application is being reviewed, it becomes public information once the patent is issued.[25]

█ Under this doctrine, if the file wrapper reveals that the patentee has surrendered claims, or has amended, narrowed, or otherwise limited his claims in response to the objections of the Patent Office, he may not later recapture what he has given up through the doctrine of equivalents. Dry Hand Mop Co. v. Squeez-Ezy Mop Co., 5 Cir. 1927, 17 F. 2d 465. A patentee's consent to the demands of the patent examiner, made to obtain his patent, operates as a "disclaimer," and he is thereafter bound by it. Schriber-Schroth Co. v. Cleveland Trust Co., 1940, 311 U.S. 211, 221–22, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132; Deller's Walker on Patents (2d ed., 1965), Sec. 234. "The disclosure pro tanto passes into the public domain." Musher Foundation v. Alba Trading Co., 2 Cir., 1945, 150 F.2d 885, 888.

The reason for this was pointed out by Judge Learned Hand, in *Musher, supra,*

"[I]f the rejection [by the Patent Office] is wrong, the applicant has remedies both in the Patent Office and in the courts: remedies which the cancellation of the rejected claim necessarily surrenders." After the patent has been issued, the public may examine the file wrapper to determine what has been patented and what has been relinquished by the patentee; hence "the injurious consequences to the public and to inventors and patent applicants if patentees were thus permitted to revive cancelled or rejected claims and restore them to their patents are manifest." Schriber-Schroth Co. v. Cleveland Trust Co., *supra,* 311 U.S. at 221, 61 S.Ct. at 240.

Plaintiff urges that the doctrine of file wrapper estoppel applies only to those claims amended or withdrawn in order to overcome objections based on the prior art, correctly citing as authority the decision of the Tenth Circuit in McCullough Tool Co. v. Well Surveys Inc., 1965, 343 F.2d 381, 403, in which the court said the doctrine "is not applicable where the patentee's difficulty results not from prior art similarities but from the wording and indefiniteness of the claims."[26] And, other courts have referred to the doctrine, in *dicta,* in terms of prior art rejections.[27]

On the other hand, the First and Sixth Circuits have said the doctrine extends to all cancellations and amendments, not just those based on the prior art. *See,* Borg-Warner Corp. v. Paragon Gear Works, 1 Cir., 1965, 355 F.2d 400; Parke-Davis & Co. v. American Cyanamid Co., 6 Cir., 1953, 207 F.2d 571. In *Borg-Warner, supra,* a limitation in a claim had been introduced solely to overcome a rejection due to indefiniteness, not to overcome a rejection based on the prior art.

25. *See,* Koykka, Infringement of Patents, 42 F.R.D. 43, 66 (1967).

26. *See also,* Sears, Roebuck & Co. v. Jones, 10 Cir., 1962, 308 F.2d 705.

27. For example, the Supreme Court said in Graham v. John Deere Co., *supra,* 383 U.S. at 33, 86 S.Ct. 702: "claims that

have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent." *See also,* Matherson-Selig Co. v. Carl Gorr Color Card, Inc., N.D.Ill., 1967, 154 U.S. P.Q. 265, 277–279.

"We think of no reason, and find none suggested in the cases, why the importance and materiality of language in a claim depend upon the particular objection the Patent Office had voiced," Judge Aldrich concluded, for:

"A patent may be just as invalid because the description is inadequate as it may be because of the prior art, * * * and the examiner is as much within his rights in making one type of objection as another. Examiners doubtless on occasion overemphasize the formal requirements of 35 U.S.C. § 112. But, equally, they may demand changes in order to avoid alleged impingement upon prior inventions when in fact there is none. If an applicant who accedes to a demand based on the prior art is thereafter estopped to contest its necessity, he should equally be estopped to deny the correctness of a demand for which some other reason is given. To a party examining the file to determine the true scope of what has been granted, and finding something affirmatively disclaimed, it should make no difference what was the purpose of the disclaimer." 355 F.2d at 406.

■ To distinguish between prior art rejections and amendments and those based on other grounds is inconsistent with the rationale of the doctrine and would "tend only to further shroud the doctrine * * * in an endless veil of confusion." Dvorak, "That Perplexing Problem—The Doctrine of File Wrapper Estoppel," Volume L, Journal of the Patent Office Society, 143, 146 (1968). As defendant contends, the doctrine properly applies to all patent office "surrenders."

■ The file wrapper reveals that claim one was initially rejected by the Patent Office on grounds of inoperability, indefiniteness, and aggregation. In the course of urging that the patent be granted, after amendments had been filed to some of the rejected claims including claim one, counsel for plaintiff formally remarked:

" * * * [W]e agree that a mere plurality of knives do not constitute invention when the plurality is of a number of knives spaced successively in the same position. However, when as in this device the plurality is of knives placed in different positions to achieve a desirable result which could not otherwise be obtained, we believe that the plurality constitutes invention, the arrangement of the knives being, of course, the critical feature."

After stressing the "critical" nature of the knife arrangement in the '218 slitter in order to obtain its patent, plaintiff may no longer assert that defendant's rocking trough is the equivalent of the inclined knives that are required by claim one. The doctrine of file wrapper estoppel therefore forecloses application of the doctrine of equivalents to claim one.

■ But no similar file wrapper estoppel applies to claim three. The mere surrender or amendment of a claim in the Patent Office does not forever bar a patentee from asserting the doctrine of equivalents. He is estopped only from reclaiming what he surrendered. Borg-Warner Corp. v. Paragon Gear Works, *supra*, 355 F.2d at 406.[28] Hence it is necessary to determine what in fact plaintiff gave up in order to receive its patent,[29] and what is the essence or "pith and marrow" of the invention that remains. U.S. Peg-wood, Shank, and Leather Board Co. v. Sturtevant Co., 1

---

28. "One may not seek redress of an alleged infringement of his patent when the concept disclosed and claimed is not equivalent to what he now asserts is his invention. The purpose of the doctrine of file wrapper estoppel, then, is to prevent one from asserting a claim to something which is not his." Dvorak, "That Perplexing Problem—The Doctrine of File Wrapper Estoppel," Volume L, Journal of the Patent Office Society, 143, 150 (1968).

29. Edward Valves, Inc. v. Cameron Iron Works, Inc., 5 Cir., 1961, 286 F.2d 933.

Cir., 1903, 125 F. 382, 384; Dvorak, That Perplexing Problem, *supra* at 147.

As initially filed, the last sentence of claim three included the words: " * * and a water spray to the trough for flushing out the vein through the severed membrane." After the claim was rejected, this phrase was amended to read: "and a water spray to the trough *directed upon the shrimp for sliding shrimp down the trough* and for flushing out the vein through the severed membrane." (Emphasis supplied). Because of the Patent Office's objections for inoperability and aggregation, the claim was amended to specify that the water supply is used "for sliding shrimp down the trough."

But no one who read the file wrapper as a whole would reasonably conclude that the addition made in the prosecution of this claim in response to specific rejections by the Examiner was intended to limit the claim to a water supply "directed upon the shrimp." Certainly the Patent Office did not require that the claim be limited in this manner. Claim one, which was approved by the Examiner, refers simply to "a water supply to said trough." "[T]here is no reason to presume that [an] applicant made a disclaimer broader than necessary to yield to the actual challenge to his claim." Hunt Tool Co. v. Lawrence, 5 Cir., 1957, 242 F.2d 347, 354.

In describing his device in claim three, plaintiff did not voluntarily narrow or limit his discovery. Its essence remains unchanged, and plaintiff is not estopped from asserting that claim three is infringed under the doctrine of equivalents.

## VALIDITY OF THE PLAINTIFF'S DEVEINER PATENT ('927)

The deveiner developed by the Lapeyres like the slitter they invented incorporates no new mechanical principles. It is a novel combination of previously known elements.

After the Lapeyres developed their slitter, they turned to the problem of removing the veins from the backs of the now slit shrimp. Some veins were removed in the slitter trough by the action of the water, but many shrimp were still not deveined although their back muscles and sand bags (or membranes) had been cut. When it did not devein, the slitter left the vein exposed up to the fifth segment of the shrimp's body at which point it descends on a plane through the body. There was thus a very tiny soft and thread-like piece of stringy matter to be physically detached, not merely separated, from the body of the shrimp.

Prior attempts to remove the veins from slit shrimp had fallen into two general categories: (1) gouging or sawing them out as part of the slitting process before the '218 machine was developed, or (2) boiling or soaking them out while blanching the shrimp after they had been slit by hand. The Lapeyres first moved generally in the second direction, i. e., vein removal separate from the slitting process. They tried to remove veins by agitating shrimp in water and by bubbling air through the water. They also tried placing the slit shrimp in a hardware mesh basket and in an expanded metal basket, dipping the shrimp-basket into the water, raising it, and moving the shrimp through the water. In addition, they tried passing the slit shrimp through a shrimp cleaning machine.

None of these experiments resulted in a commercially acceptable level of vein removal. The Lapeyres then decided that effective deveining could be achieved only by mechanically engaging the vein and forcibly pulling it from the shrimp. Because of the large ratio of the length of the vein to the radius of its cross-section, transverse engagement was most practical. The Lapeyres therefore developed a device based on wedge-like projections that serve to hook the vein and then wedge and hold it. This represented a departure from the prior art, which was based on the vein being removed by means whose motion, if any, was longitudinal rather than transverse to the body of the shrimp.

The Lapeyres found a standard punch lip material illustrated in a commercial catalog. Most important for their purposes, the interior circumference of this material contained the projections needed to engage the veins of the slit shrimp. Hence they used the material for the outside surface of their drum.

Defendant urges that the '927 patent is invalid as aggregative, anticipated by the prior art, obvious, described in functional language, overbroad, and indefinite. While it is clear that the elements in the '927 patent, especially the punch lip material, had been available for a considerable period of time, when combined they co-act in such a manner to perform a new function and produce new results.

▮▮▮ Although "combination patents are viewed strictly," [30] and require a high standard of invention in order to be sustained,[31] a combination clearly is patentable when it "produces a new and useful result," and emerges from "inventive skill" and imagination rather than mere "mechanical aptitude." Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783, 790.[32] The Fifth Circuit said in *Robertson, supra:* [33]

"Judges who have tried many patent cases, who have heard the testimony of experts, the one affirming the matter to be merely an advance in mechanical steps, the other to be invention of the highest order; the one affirming prior use, the other denying it; the one affirming it to be the flight of genius *into* new fields, the other, the mere dull trudging of an artisan, know that for a just decision of such causes no objective criteria can be relied on. They well know that there must be in the trier something of the same imaginative response to an idea, something of that same flesh of genius that there is in the inventor, which all great patent judges have had, that intuitive brilliance of the imagination, that luminous quality of the mind, that can give back, where there is invention, an answering flash for flash."

This court lacks the vanity to claim qualification under this definition. Reality constrains it instead to confess that to it, as to Marianne Moore's Steamroller: "The illustration is nothing * * * without the application." But, even to a mind thus limited, it is clear that in this case, "the [Lapeyre] combination is a different invention from the elements themselves, whether considered in their separate or their aggregated state," and that "the method of their cooperation in the combination [is] the result of [an] inventive act." I, Robinson on Patents, 219–223; Pursche v. Atlas Scraper and Engineering Co., 9 Cir., 1961, 300 F.2d 467, 473–474. As Judge Hand pointed out some 42 years earlier, in another case involving the validity of a combination patent:

"[T]he case is in substance familiar enough, one in which the inventor has culled this and that out of nearby arts, and so formed a combination nowhere before existing. It has been a success; it has substantially driven out earlier cumbersome methods; it has enabled the art to do with ease what before it could only do slowly and imperfectly. The result seems to [be] a genuine invention, and [this court] so hold[s]." Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 1927, 18 F.2d 66, 69.[34]

30. Glikin v. Smith, 5 Cir., 1959, 269 F.2d 641, 651–652.

31. Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 90–92, 62 S.Ct. 37, 86 L.Ed. 58.

32. *See also,* United States v. Adams, 1966, 383 U.S. 39, 50, 86 S.Ct. 708, 15 L.Ed. 2d 572; Special Equipment Co. v. Coe, 1945, 324 U.S. 370, 377, 65 S.Ct. 741, 89 L.Ed. 1006; Grinnell Washing Machine Co. v. E. E. Johnson Co., 1918, 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 1196; Kaakinen v. Peelers Co., 9 Cir., 1962, 301 F.2d 170, 172–173.

33. Quoting from "Function of the 'Hunch' in Judicial Decision," Judgment Intuitive, Foundation Press, 1938.

34. "It may be laid down as a general rule, though perhaps not an invariable

Neither was the '927 patent anticipated by the prior art (as the findings of fact illustrate), nor "obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. 103.[35]

The patent, however, does have its defects. In addition to presenting a patentable invention, a patentee must comply with 35 U.S.C. § 112, which provides, "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "A patent must be a certain guide; not a congeries of pregnant suggestions." Harries v. Air King Products Co., 2 Cir., 1950, 183 F.2d 158, 160. "This requirement serves two primary purposes: those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention." Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 1958, 258 F.2d 124, 136.[36]

Plaintiff alleges that claims 1, 12, 13, 14, 15, 17, and 18 of the '927 patent have been infringed. Of these seven claims, all but claim one are hopelessly vague and indefinite. Claim 12 is an example:

"A shrimp vein remover comprising; hook-like vein engaging means, shrimp moving means operatively associated with said vein engaging means, and means associated with at least one of said above named means for effecting relative movement therebetween."

"Absolute precision in the wording of claims, while desirable, would be an unreasonable burden to impose on an inventor." Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc., 5 Cir., 1965, 350 F.2d 885, 892. But the language in claims is expected to be "as precise as the subject matter permits." Georgia-Pacific Corp. v. United States Plywood Corp., supra, 258 F.2d at 136. Claims 12, 13, 14, 15, 17, and 18 do not accurately describe and are not limited to the scope of the Lapeyres' invention. They are therefore invalid under 35 U.S. C. § 112.

Plaintiff's invention is capable of verbalization, however, and it was comprehensibly described and limited in claim one:

"In a shrimp vein remover, a supporting member, a lip projecting at an acute angle from the supporting member and having a smooth rounded free edge for engaging beneath the vein of a shrimp and for wedging the vein between the lip and the supporting member, and means operatively associated with said supporting member for relatively moving the shrimp with respect to said member to cause separation of the vein from the shrimp meat."

While this language can claim no prizes for clarity or artistry, "it is impossible to suppose that anyone who really wished to respect the patent would have any difficulty in identifying what the claim covered." Musher Foundation v. Alba Trading Co., 2 Cir., 1945, 150 F.2d 885, 889. Claim one is valid.

## INFRINGEMENT

Unlike plaintiff's machine, the Deepsouth deveiner does not use a drum. But it uses the same perforated material em-

---

one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention." Webster Loom Co. v. Higgins, 1881, 105 U.S. 580, 591, 26 L.Ed. 1177. See also, Grinnell Washing Machine Co. v. E. E. Johnson Co., supra.

35. See, Graham v. John Deere Co., supra, 383 U.S. at 17, 86 S.Ct. 684; Note, Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169 (1964).

36. See also, Universal Oil Products Co. v. Globe Oil and Refining Co., 1944, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399; United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232.

ployed by the Laitram deveiner in essentially the same manner to perform the same function. Instead of putting the perforated material on a drum, Deepsouth makes it into a belt. The rounded edges of the lip-like projections hook the veins of the slit shrimp and serve to wedge them between the lips and the remaining metal surface. The veins then are broken or cut by the rounded sharp edges of the lips.

There are some minor differences between the two deveiners. In the Deepsouth machine, the conveyor engages the shrimp while they are moving upward out of a pool of water. The perforated material is arranged to rotate continuously. The lips face outward and devein the shrimp on the outer surface of the arc. In the Laitram deveiner, the lips face inward and deveining occurs within the drum.

Deepsouth's deveiner also uses less water than Laitram's, but this difference is occasioned merely by the difference in the form of the working surface, not by any difference in function or result. Both machines use water to bring the shrimp into position for the lips to engage the veins, and in both, water flows from the side of the working surface that contacts the shrimp to the opposite side of the working surface. In addition, in both machines, water serves to wash the surface clean.

The working surface in Deepsouth's deveiner moves faster than in Laitram's drum, but this primarily affects the amount of time during which each shrimp is exposed to the protruding lips, not the function performed by the lips. The principal purpose served by both the Laitram drum and the Deepsouth belt is propelling or conveying the shrimp.

 Claim one of plaintiff's '927 patent has been literally infringed by Deepsouth's deveiner. The language of

the claim reads directly on defendant's machine.

In addition, since defendant's deveiner performs "substantially the same function in substantially the same way to obtain the same result" [37] as the deveiner patented by the Lapeyres, claim one of plaintiff's '927 patent has also been infringed under the doctrine of equivalents.

## NEGATIVE DOCTRINE OF EQUIVALENTS

 Deepsouth contends that even if its deveiner is within the literal language of the claims of the '927 patent, there is still no infringement because of the applicability of the "negative doctrine of equivalents": [38] a device that falls within the literal words of a patent claim may still not infringe the claim when it "is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way." Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 608–609, 70 S.Ct. 854, 94 L.Ed. 1097. [39] Like the "positive" doctrine of equivalents, this prevents the triumph of form over substance.

But there is no room to apply negative equivalents here. Deepsouth's deveiner not only falls within the literal words of claim one of the '927 patent, but it is based on virtually identical principles performing the same function in substantially the same way to obtain the same result.

## THE '218 AND '927 PATENTS ARE ENFORCEABLE AGAINST DEEPSOUTH

 Defendant contends additionally that plaintiff is estopped from claiming infringement of the '218 and '927 patents by estoppel and laches. Both of these doctrines are equitable in origin and

37. Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L. Ed. 147.

38. This doctrine is sometimes referred to as the doctrine of equivalents in reverse.

39. *See also*, Foster Cathead Co. v. Hasha, 5 Cir., 1967, 382 F.2d 761, 765; C. Pigott, Equivalents in Reverse, 43 Journal of the Patent Office Society, 291–292 (1966).

neither can be invoked in the absence of a showing of prejudice. Delay that does not result in a prejudicial change of position is not laches, and conduct that does not lead to detrimental reliance does not estop. Shaffer v. Rector Well Equipment Co., 5 Cir., 1946, 155 F.2d 344; Collison Surgical Engineering Co. v. Murray-Baumgartner Surgical Instrument Co., D.Md., 1964, 230 F.Supp. 572, .580–581, aff'd, 1965, 343 F.2d 162. Since Deepsouth was not prejudiced by Laitram's delay in filing suit nor misled to its detriment by its actions, this suit is not barred and both the '218 and '927 patents are enforceable.

Plaintiff is entitled to an accounting and proper damages for patent infringement and to an injunction against further infringement by defendant of Patents 2,694,218 and 2,825,927. Counsel for plaintiff shall prepare and submit to the court, after first affording counsel for defendant an opportunity for inspection, a proposed form of judgment in accordance with this opinion. Objections, if any, to the form of judgment shall be communicated to the court.